**O. R. MITCHELL MOTORS, INC., Appellant,**

v.

**Charles R. BELL, Appellee.**

No. 15288.

Court of Civil Appeals of Texas, San Antonio.

Nov. 13, 1974.

Rehearing Denied Oct. 8, 1975.

Second Motion for Rehearing Denied Oct. 29, 1975.

A. W. Worthy, Gresham, Davis, Gregory, Worthy & Moore, San Antonio, for appellant.

Morriss & Morriss, San Antonio, for appellee.

CADENA, Justice.

Plaintiff, Charles R. Bell, filed this suit to recover from defendant, O. R. Mitchell Motors, Inc., the statutory penalties of double the time price differential on a retail installment contract for the sale of an automobile to plaintiff by defendant. Following a nonjury trial and based on findings that defendant had violated Article 5069–7.-02 of the Consumer Credit Code (Articles 5069–1.01 et seq., Tex.Rev.Civ.Stat.Ann.) in three respects, the trial court rendered judgment that plaintiff recover the sum of $675.02, representing an amount equal to double the time price differential provided for in the contract, and the further sum of $700.00 as attorneys' fees. This is the judgment from which defendant appeals and plaintiff, by way of cross-point, asserts that the trial court erred in not awarding the statutory penalty for each violation.

The term, "Consumer Credit Code," is generally applied to Title 79 of the Revised Civil Statutes of this State. We are here primarily concerned with Chapters 7 and 8 of Subtitle 2 of Title 79. Chapter 7 of Subtitle 2 (Articles 5069–7.01 through 5069–7.10) applies to motor vehicle installment sales, while Chapter 8 (Articles 5069–8.01 through 5069–8.05) primarily deals with penalties applicable to violations of Subtitle 2.

In this opinion, when reference is made to pertinent provisions of the Code, the number "5069" will be omitted. Thus a reference to "Article 7.02(2)" shall be understood as a reference to Article 5069–7.02(2).

The trial court found that the contract documents in this case did not meet the requirements of the Code in that the printed portion of the retail installment contract was not in a size equal to at least eight-point type, as required by Article 7.02(2); the acknowledgment by the buyer of receipt of a copy of the contract did not appear "directly above" the buyer's signature as required by Article 7.02(4); and the contract did not specifically set out the "aggregate amount" included for insurance, as required by Article 7.02(6)(d).

The judgment below is based on Article 8.01 of the Code, which provides as follows:

"Any person who violates this Subtitle by contracting for, charging or receiving interest, time price differential or other charges which are greater than the amount authorized by this Subtitle, or *by failing to perform any duty specifically imposed on him by any provision of this Subtitle,* shall forfeit to the obligor twice the amount of interest or time price differential and default and deferment charges contracted for, charged or received, and reasonable attorneys' fees fixed by the court, *provided that there shall be no penalty for a violation which results from an accidental and bona fide error.*" (Emphasis added.)

Defendant first asserts that, even if it be assumed that the contract documents fail to comply with the Code requirements in the three particulars found by the trial court, there is no basis for imposing liability on it. This argument is based on the language of Article 7.02 and Article 8.01. The statutory provisions relating to the contents and forms of the retail installment contract which are pertinent here provide:

1. "The printed portion of the . . . contract, . . . shall be in size equal to at least eight-point type." Article 7.02(2).

2. "The seller shall deliver to the buyer, or mail to him at his address shown on the . . . contract, a copy of such contract as accepted by the seller. Until the seller does so, a buyer who has not received delivery of the motor vehicle shall have the right to rescind his contract . . . . *Any acknowledgment by the buyer of delivery of a copy of the . . . contract shall be in a size equal to at least ten-point bold type and shall appear directly above the buyer's signature.*" Article 7.02(4). (Emphasis added to indicate the requirement found by the court to have been violated in this case.)

3. "The . . . contract shall specifically set out the following items: . . . (d) The aggregate amount, if any, included for insurance if a separate identified charge is made therefor, specifying the type or types and the term of coverage; . . . ." Article 7.02(6)(d).

Defendant contends that the portions of the code here applicable merely provide that the written instrument shall meet certain requirements and contain no language imposing on the seller the duty to assure that the contract conforms to the statutory specifications. Since Article 8.01, defendant's argument continues, imposes a penalty only on a person who fails "to perform" a "duty specifically imposed on him by any provision of" Subtitle 2, no penalty can be imposed on it in this case, since the pertinent provisions of Article 7.02 do not "specifically" impose a duty on the seller.

Defendant's argument is insufficient to persuade us to construe the legislative scheme, which was intended to prevent "abusive and deceptive practices in the conduct of their businesses" by "lenders and vendors" (Acts 1967, 60th Leg. p. 608, § 1) as consisting of no more than a series of precatory incantations.

■ Defendant urges that a retail credit seller, or, at least, defendant in this case, does not ordinarily prepare the contractual documents which contain the terms and conditions of the credit transaction, but, instead, uses documents prepared by a lending or financing institution which acquires the obligation by assignment from the seller, and that, for this reason, the legislature chose not to impose "specifically" on sellers of automobiles on credit the "duty" to prepare and complete the contractual documents, or to take any precaution to see to it that the contractual documents conformed to the statutory requirements. It may be that the legislature realized that credit vendors of motor vehicles do not, in fact, prepare the documents which embody the terms and conditions of the credit transaction but, instead, rely on the person to whom they regularly assign such documents. But it is at least as likely that the legislature knew that the buyer, the person whose interests were intended to be protected, did not furnish the necessary documents, and that in all such transactions the buyer merely signed instruments handed to him by the seller, who completed the instruments and handed them to the buyer, in purportedly complete form, with the request that the buyer "sign here." Much lip-service, of course, has been given to the canon that a statute which imposes a penalty should be "strictly" construed. *Van Zandt v. Fort Worth Press*, 359 S.W.2d 893, 895 (Tex.1962). But this canon is simply a guide to be used when resort to it furthers the legislative purpose. The cardinal rule of construction which, significantly, has been expressly adopted by the legislature, is that "the court shall look diligently for the intention of the Legislature, keeping in view at all times the old law, the evil and the remedy." Tex.Rev.Civ.Stat.Ann. Article 10(6) (1969). None of the legislative mandates concerning statutory construction which are embodied in Article 10 speak of "strict construction," with the exception of Paragraph 8, which contains the express command, often ignored by our courts, that the rule of the common law that statutes "in derogation thereof" shall be strictly construed "shall have no application" and further commands that the statutes "shall be liberally construed with a view to effect their objects. . . . ." A similar legisla-

tive distaste for a "strict construction" canon first found expression, with respect to criminal statutes, in 1856, and, despite judicial reluctance to accept the legislative pronouncement, has been carried forward into the provisions of our present Penal Code in the forthright statement to the effect that the common law rule "that a penal statute is to be strictly construed does not apply to this code." Tex.Penal Code Ann. § 1.05(a) (1974) and accompanying Practice Commentary.

▇▇▇ In view of the clear legislative intent to protect buyers by preventing abusive and deceptive practices by sellers, and to achieve this objective by regulating the conduct and activities of sellers, there can be no doubt that the legislature intended to achieve its goal by imposing duties on the persons who, in the legislative judgment, had, under the old law, been guilty of abusive and deceptive practices. Thus, there can be no doubt that the purpose of Article 7.02 was to impose duties on sellers, the persons who, in the ordinary course of business, as did defendant here, present to the buyer a document ready for the buyer's signature. Regulation presupposes control by imposition of rules and standards to be followed, and it would be nonsensical to hold that the legislature sought to impose rules and standards to be followed by sellers without imposing a duty on the regulated persons to comply with such rules and standards. To attempt to regulate the conduct of a class of persons without imposing duties on the members of the regulated class would be an attempt to regulate by not regulating. It is obvious that, if the legislative attempt to protect the credit buyers of motor vehicles is to be regarded as anything other than an exercise in futility, the legislative pronouncements concerning the form and contents of the retail installment contract must be construed as imposing duties on the seller, since it is the conduct of the seller which the legislature sought to regulate.

▇▇▇ Our conclusion that it is the duty of the seller to see to it that the retail installment contract conforms to the statutory specifications finds support in the requirement, in Article 7.02(4), that the seller shall deliver to the buyer a copy of "such contract." The term "such contract" can only refer to the retail installment contract, and, clearly, the retail installment contract which the legislature had in mind is a contract which conforms to the requirements of the statute. Delivery by the seller to the buyer of a contract which is not in a size at least equal to eight-point type, in which the acknowledgment of receipt of a copy of the contract does not appear directly above the buyer's signature, and which does not specifically set out the aggregate amount included for insurance is not a delivery of "such contract" as contemplated by the statute.

Defendant's first point is overruled.

Defendant does not challenge the trial court's finding that the printed portion of the contract was not in a size equal to at least eight-point type. But, by its second point of error, defendant insists that the failure of the documents to conform to the requirements concerning size of type cannot be made the basis of a judgment against it because the undisputed evidence establishes that the violation was the result of accidental and bona fide error.

Under the plain provisions of Article 8.01, there can be no penalty for a violation "which results from an accidental and bona fide error." The statute does not define "accidental and bona fide error."

Defendant is in the business of selling automobiles. The contract documents in this case were prepared by Bankers Investment Company, a limited partnership engaged in the automobile financing business and supplied by it to defendant. The evidence shows that defendant made the entries which it judged necessary for the completion of the contract in the spaces which were left blank in the printed instruments. After execution of the contract by plaintiff and defendant, defendant assigned the con-

tract to Bankers Investment Company, which, at the time of the trial, was the holder of the contract.

The trial court found that defendant relied on Bankers Investment Company to furnish to defendant "forms which complied with the Texas Consumer Credit Code," and that Nelson Miller, one of the general partners of Bankers Investment Company, had ordered the forms which were subsequently supplied to defendant. According to the trial court's findings, Miller instructed the printer to use a minimum type size of not less than eight-point type, and that Miller relied on the printer and in good faith believed that the type size conformed to the statutory requirements. The court further found that Miller relied on the advice of counsel that such forms, when properly completed and signed, would comply with the provisions of the Code. The trial court made no findings concerning the bona fides of defendant, except insofar as the above findings might be relevant to that issue, and expressly refused to find that defendant "believed in good faith" that the forms furnished to it complied with the statutory requirements.

In its brief, defendant asserts that the findings show that the forms were ordered with a minimum type size meeting the statutory requirements and were believed to comply with the statute and with the instructions given the printer. The actual finding was to the effect that the forms were ordered, and the instructions relating to type size given, by Bankers Investment Company, not by defendant. Defendant then asserts that, as far as it is concerned, "the mistaken inclusion by the printer, contrary to the instructions given him, of a smaller, but heavier face type, can only be attributed to an accidental error made in good faith."

■ The evidence does not establish as a matter of law that the defect in the document as to the type of size was the result of an accidental or bona fide error on the part of defendant. In its brief, as pointed out, defendant speaks of a mistake on the part of the printer. There is no evidence to indicate that the use of a smaller type by the printer was the result of a mistake on his part. In any event, the mistake of the printer cannot be treated as the mistake of defendant and, assuming that the printer did, in fact, make a mistake, and that such mistake was made by the printer in good faith, we find no basis for imputing the good faith of the printer to defendant, any more than we would impute the bad faith of the printer, who had no connection with defendant, to defendant.

It may be, too, that the evidence establishes the existence of an accidental and bona fide error on the part of Bankers Investment Company and of its officer, Miller. But neither Bankers Investment Company nor Miller, who had no connection with defendant, are named as defendants, and when we consider the liability of defendant, our sole concern must be with the good faith of defendant, and not of some third party. The testimony in this case is not lengthy, and a reading of the record discloses no evidence indicating that defendant, or any of its employees, actually believed that the type was at least eight-point type. This explains the refusal of the trial court to find that defendant believed in good faith that the printed forms complied with the Code. Evidence to the effect that X gave certain instructions to Y and that X in good faith believed that Y had followed such instructions is not evidence that Z acted in good faith.

Defendant's second point is without merit.

We agree with defendant that the contract in question complies with the requirement that the buyer's acknowledgment of receipt of a copy of the contract appears "directly above" the buyer's signature and that, therefore, the trial court erred in finding a violation of Article 7.02(4).

The pertinent portion of the printed form is as follows:

"Buyer acknowledges he (she) has read and received a completed copy of this agreement including the conditions on the reverse side.

Salesman

Buyer
Signs

Co-buyer
Signs

Approved By
By _____ "

In this case, on the blank line designating "Salesman" appears a signature, apparently that of the salesman. On the line immediately below this appears the signature of plaintiff, the buyer, and on the line immediately below this there appears the signature of plaintiff's mother. Another signature appears on the next and last line.

 It is true, as plaintiff points out, that between the signature of the buyer and the acknowledgment of receipt of delivery of a receipt of a copy of the contract there appears the signature of the salesman. But, even if we accept plaintiff's definition of "directly" as "without anything intervening," we conclude that the receipt of acknowledgment in this case does appear directly above the buyer's signature. A reasonable interpretation of the statutory language, bearing in mind the legislative purpose and the evil was the concern of the lawmakers, compels the conclusion that it was intended that the acknowledgment of receipt of a copy of the contract not be "buried" among other provisions of the contract. Here, no contractual provision, term, condition or recital intervenes between the acknowledgment and the buyer's signature. Except for the word "salesman," there is no printing between the buyer's signature and the acknowledgment. We find no basis for holding that the intervening line for the signature of the salesman had the effect of diverting the buyer's attention from the last paragraph of the contract itself which contains the acknowledgment.

Finally, defendant urges that the trial court erred in concluding that the contract violated Article 7.02(6)(d) because it did not specifically set out "the aggregate amount, . . . included for insurance. . . ."

Under the heading, "Credit Sale Disclosure Statement," there appear 20 statements. The first four set out the cost of the vehicle ($1,295.00), state and local taxes ($51.80), license and "titles" fees ($1.25), and installation and/or make ready charge ($10.00). The total of these amounts is entered on the fifth line with the designation, "cash price" ($1,358.05). The next five entries disclose total amount of down payment ($300.00), and the eleventh disclosure shows the unpaid balance of the cash price as being $1,058.05.

Line 12 sets out the amount of $328.00 for physical damage insurance for 12 months, and line 13 shows a subtotal of $1,386.05, representing the unpaid balance of the cash price plus the cost of physical damage insurance. Lines 14 and 15 show credit life insurance ($24.64) and health and accident insurance ($42.68), with the statement that both types of insurance are required for the term of the contract. Line 16 shows the "amount financed" as being $1,453.37, which is the total of the unpaid balance of the cash price ($1,058.05), the cost of physical damage insurance ($328.00), and the cost of credit life insurance ($24.64) and health and accident insurance ($42.68).

Line 17 shows a "finance charge" of $337.51, while line 18 designates the "total amount of payments" ($1,790.88). Line 20 discloses the "deferred payment price," which is the sum of the down payment ($300.00) and the "total amount of payments" ($1,790.88), or $2,090.88. The final disclosure shows the annual percentage rate to be 22.36%.

It is plaintiff's contention that the requirement that the contract specifically set out the "aggregate amount, if any, included for insurance" means, in this case, that the agreement disclose the sum of the charges made for each type of insurance; that is, there should have been included a separate entry showing the amount $395.32, repre-

senting the combined cost of physical damage insurance ($328.00), credit life insurance ($24.64) and health and accident insurance ($42.68).

We agree with defendant that the contract here complies with the requirements of Article 7.02(6)(d). It cannot be persuasively argued that the instrument is deceptive in any way insofar as the charges for insurance are concerned. There is a specific identification of each element of the additional cost of buying on credit instead of paying cash. There is a full disclosure of the type or types of insurance and of the terms and coverage of such insurance. Stated differently, we hold that the Code requirement concerning the cost of insurance is satisfied if the instrument discloses the aggregate cost of each type of insurance.

Since we have concluded that the record establishes but one violation of the Code, it is unnecessary to consider plaintiff's contention that, in cases involving multiple violations, plaintiff is entitled to recover the statutory penalty for each violation.

The judgment of the trial court is affirmed.

### On Motion for Rehearing.

In its motion for rehearing, appellant insists, among other things, that the evidence establishes that the use of smaller type than that required by the Consumer Credit Code was the result of an accidental and bona fide error. As in the original opinion, we shall refer to appellant as "defendant."

Our discussion of the defense of accidental and bona fide error will be based on the assumption that Bankers Investment Company, which furnished the form used by defendant, acted in good faith, and that the failure of the instrument to meet the statutory requirements relating to type size was the result of an accidental and bona fide error by Bankers. We need not concern ourselves with the conduct or state of mind of the printer, since there is no evidence indicating that the printer did not intentionally and deliberately use the smaller type size and, therefore, there is no evidence of accidental and bona fide error on the part of the printer.

We specifically hold that defendant did not discharge its burden of proof by establishing accidental and bona fide error on the part of Bankers. The relevant conduct is the conduct of defendant, and not the conduct of a third party. For example, if defendant established that the violation was the result of an accidental and bona fide error on its part, plaintiff could not circumvent that defense by showing that Bankers acted in a deliberate, intentional and fraudulent manner.

We here concern ourselves with defendant's contention that the finding that it relied on Bankers to furnish it with forms which complied with the requirements of the Code necessarily establishes that the violation was the result of an accidental and bona fide error by defendant, despite the trial court's deliberate refusal to make a finding attributing the violation to accidental and bona fide error on the part of defendant.

As defendant points out, the dictionary defines "rely" as "To rest with confidence, as when satisfied of the veracity, integrity or ability of persons, or of the certainty of facts or of evidence; to have confidence; to trust; to depend; . . .."

Even if it be assumed that defendant was justified in having confidence in Bankers; that defendant was satisfied of the veracity, integrity or ability of Bankers; and that defendant's trust in, and dependence on, Bankers rested on defendant's knowledge of Bankers' methods of doing business and reputation, such reliance would not establish defendant's good faith belief that Bankers had performed in the anticipated

manner. It is one thing to believe that a person will perform in a certain manner. It is another thing to believe that a person has performed in that manner. To establish that defendant acted in good faith, it is necessary to show that, after Bankers had delivered the forms to defendant, defendant believed that the forms were correct and met the statutory requirements. Certainly, it cannot be seriously argued that defendant acted in good faith if, despite its justified confidence in Bankers, defendant knew, after receiving the forms, that they did not meet the Code requirements. Justified reliance does not justify conduct engaged in with knowledge that one's reliance, however much initially justified, was misplaced.

Since the burden of establishing the defense was on defendant, it was necessary that defendant produce evidence not only that it relied on Bankers to do the right thing, but that defendant's subsequent action was based on the belief that Bankers had acted in accordance with defendant's expectations. Stated differently, it was necessary that defendant produce evidence to the effect that it had no knowledge of the fact that, with respect to type size, the forms did not meet the statutory requirements. In view of the total absence of evidence concerning defendant's knowledge, it cannot be said that the evidence establishes the defense of accidental and bona fide error as a matter of law.

The motion for rehearing is overruled.