**TOM BENSON CHEVROLET, INC., Appellant,**

v.

**Mary Esther ALVARADO, Appellee.**

**No. 16655.**

Court of Appeals of Texas, San Antonio.

June 30, 1982.

Rehearing Denied July 15, 1982.

**816**

Carl Robin Teague, San Antonio, for appellant.

Peter Torres, Jr., Kenneth L. Malone, Foster, Lewis, Langley, Gardner & Banack, San Antonio, for appellee.

Before ESQUIVEL, BUTTS and BAS-KIN, JJ.

## OPINION

ESQUIVEL, Justice.

Tom Benson Chevrolet, Inc. (hereafter Tom Benson) appeals from a judgment awarding damages under the provisions of (1) the Deceptive Trade Practices-Consumer Protection Act (hereafter DTPA)[1] and (2) the Texas Consumer Credit Code, Tex.Rev. Civ.Stat.Ann. art. 5069–7.02 (Vernon 1968)[2] (hereafter Texas Consumer Credit Code) in a suit arising from the purchase of a new Chevrolet Monza automobile.

Appellee Mary Esther Alvarado (hereafter Alvarado) brought suit against appellant Tom Benson, as seller, and appellee, General Motors Corporation (hereafter GMC), as manufacturer, claiming that (1) Tom Benson violated the Texas Consumer Credit Code by failing to enter the "true 'cash sale price' " of the Monza in the retail installment contract; and (2) Tom Benson and GMC breached the implied and express warranties of the DTPA pursuant to Tex. Bus. & Com.Code Ann. art. 17.46 (Vernon Supp. 1976–1977) and the Uniform Commercial Code—Sales, Tex.Bus. & Com.Code Ann. § 2.314 (Tex.UCC) (Vernon 1968). In its third amended original answer, Tom Benson cross-claimed against GMC for contribution and indemnity. During the course of the jury trial, appellee Alvarado moved to non-suit GMC. The trial court granted the motion for non-suit and dismissed Alvarado's suit against GMC.

The trial court submitted the case to the jury upon twelve special issues. After the jury rendered its special verdict and after the trial court overruled Tom Benson's motion for judgment notwithstanding the verdict, the trial court rendered judgment in favor of Alvarado against Tom Benson in the amount of $25,270.96 with interest assessed at nine percent (9%) per annum from May 10, 1978 until paid, plus attorney's fees. As a result, Alvarado received a final judgment of $32,570.96. The trial court also rendered a take-nothing judgment in Tom Benson's cross-claim against GMC. Tom Benson appeals.

In twenty-two of his thirty points of error, Tom Benson argues, *inter alia*, that the evidence is either legally or factually insufficient to support the jury findings of six of the twelve special issues.[3] Thus we

---

1. Tex.Bus. & Com.Code Ann. § 17.41 et seq. (Vernon Supp. 1976–1977). The DTPA, originally effective May 21, 1973, has been amended on four occasions: effective September 1, 1975; effective May 23, 1977; effective August 27, 1979 and effective August 31, 1981. The references to the DTPA in this opinion refer to the statute as amended and effective May 23, 1977.

2. Art. 5069–7.02 (Vernon 1968) has been amended once, effective August 27, 1979. References to the Consumer Credit Code in the opinion relate to the statute as effective January 1, 1968.

3. The pertinent special issues and the jury's response to them are as follows:

   Question 1. Do you find from a preponderance of the evidence that Tom Benson Chevrolet failed to state the true cash sale price in the *retail installment contract* entered into with Mary Esther Alvarado?
   In connection with question no. 1 above, you are instructed that cash price means the price stated in a retail installment contract for which the seller would have sold to the buyer and the buyer would have bought from the seller, the motor vehicle and other goods and services which are the subject of such contract if such sale had been a sale for cash. You are further instructed that the retail installment contract shall specifically set out the cash price as defined herein, and the amount of the buyer's down payment, if any, specifying the amounts paid in money and in goods traded in.
   Answer "Yes" or "No"
   Answer: [Yes]
   Question 2. Do you find from a preponderance of the evidence that Tom Benson Chevrolet, through its agents and/or employees, engaged in any deceptive trade practices (as the term has been defined for you in the charge) in connection with the sale, service or warranty of the automobile in question? It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of goods does not create a warranty. A warranty that the goods shall be fit for the ordinary purposes for which such goods are

will address each legal and factual insufficiency point of error sequentially. When both legal and factual insufficiency of evidence are raised, we should rule upon the legal insufficiency point first. *Glover v. Texas General Indemnity Co.,* 619 S.W.2d 400, 401 (Tex.1981); Calvert, "No Evidence and Insufficient Evidence Points of Error," 28 Texas L.Rev. 361, 369 (1960).

■ Where legal insufficiency points of error are raised, such as "no evidence" or "as a matter of law," we are charged with reviewing only the evidence which tends to support the findings. We also must give effect to all reasonable inferences that may be drawn properly from the findings, and we must disregard all contrary or conflicting evidence. *McClure v. Allied Stores of Texas, Inc.,* 608 S.W.2d 901, 904 (Tex.1980); *Butler v. Hanson,* 455 S.W.2d 942, 944 (Tex. 1970); *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965); O'Connor, *Evidence Points on*

*Appeal,* 37 Tex.B.J. 839 (1974); Calvert, *supra.*

On May 5, 1978, Alvarado signed a purchase agreement with Tom Benson, through a Tom Benson salesman, to buy a 1978 Chevrolet Monza for the "unit price" of $4,610.15. Pursuant to the purchase agreement, Alvarado agreed to trade her 1975 Dodge automobile in exchange for $350.00 credit, leaving a balance of $4,393.45. Although the purchase agreement in evidence was not signed by any employee of Tom Benson, Tom Benson's new car sales manager testified that he approved the purchase agreement.

When the motor vehicle retail installment contract was prepared, the "cash price" of the Monza was listed as $4,756.52. On May 10, 1978, both Alvarado and the Tom Benson business manager signed the retail installment contract, which contained the different price of $4,756.52 rather than the purchase agreement price of $4,610.15. Af-

used is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Tom Benson Chevrolet is a merchant with respect to automobiles.

Answer "Yes" or "No"

Answer: [Yes]

Question 4. What sum of money, if any, if paid now in cash, do you find from a preponderance of the evidence would fairly and reasonably compensate Mary Esther Alvarado for damages, if any, resulting from the deceptive trade practices of Tom Benson Chevrolet, acting through its agents and/or employees, if any?

You will consider the following elements of damages, if any, and none other:

a. reasonable and necessary medical expenses, if any. Answer in dollars and cents, if any: [$75.00]

b. physical pain and mental anguish in the past, if any. You are instructed that damages cannot be recovered for every mental disturbance or injury to the feelings, and to be "mental anguish" there must be something more than mere worry, vexation, disappointment, anger or resentment. Answer in dollars and cents, if any: [$3,000.00]

c. loss of use of automobile in question, if any. Answer in dollars and cents, if any: [$330.00]

d. loss of wages, if any. Answer in dollars and cents, if any: [$200.00]

e. diminished market value, if any, of the automobile in question as a result of any defects at the time of delivery to Mary Esther Alvarado, if any defects you have so found.

"Market value" means the amount of money which would be paid in cash by a willing buyer who desires to buy, but is not required to buy, to a willing seller who desires to sell, but is under no necessity of selling. Answer in dollars and cents, if any: [$4,100.00]

Question 6. Do you find from a preponderance of the evidence that Tom Benson Chevrolet failed to perform all required service on the 1978 Monza in question in a good and workmanlike manner?

Answer "Tom Benson failed" or "Tom Benson did not fail".

Answer: [Tom Benson failed]

Question 10. Do you find from a preponderance of the evidence that General Motors Corporation received no written notice of Tom Benson Chevrolet's complaint before May 23, 1979?

Answer "General Motors received no written notice" or "General Motors received written notice."

Answer: [General Motors received no written notice]

Question 11. Do you find from a preponderance of the evidence that General Motors Corporation was not given a reasonable opportunity by Tom Benson Chevrolet to cure the defects, malfunctions, if any you have found in the 1978 Chevrolet Monza automobile in question before May 23, 1979?

Answer "General Motors was not given a reasonable opportunity" or "General Motors was given a reasonable opportunity."

Answer: [General Motors was not given a reasonable opportunity]

ter subtracting the total down payment plus trade-in, insurance fees, taxes, license and registration fees and certificate of title fee, the unpaid balance on the retail installment contract was $4,309.36.

At trial, Alvarado argued that Tom Benson failed to state the "true 'cash sale price'" of the car in the retail installment contract as required by the Texas Consumer Credit Code. Alvarado introduced the purchase agreement, over Tom Benson's timely objection, as well as the GMC vehicle description,[4] without objection, as evidence of Tom Benson's failure to set forth the price for which Alvarado agreed to purchase the car. Thus the first question raised in appellant's first five points of error is whether there was any evidence to support the jury's finding that Tom Benson failed to state the "true 'cash sale price'" of the car in the retail installment contract.

■ Article 5069–7.02(6)(a) (Vernon 1968) required that the retail installment contract set out the "cash sale price as defined in art. 5069–7.01." In pertinent part, art. 5069–7.01 (Vernon 1968) provides:

> (f) "Cash Sale Price" means the price stated in a retail installment contract *for which the seller would have sold to the buyer and buyer would have bought from the seller*, the motor vehicle which is the subject matter of such contract if such sale had been a sale for cash. The cash sale price may include any taxes, registration, certificate of title and license fees, and charges for delivering, servicing, repairing, altering or improving the motor vehicle. [Emphasis added.]

It is clear that the purchase agreement was admissible for the purpose of showing the price the buyer would have paid to the seller. Extrinsic evidence of a written agreement is admissible to show false, misleading or deceptive practices as it is to show fraud. *United Postage Corp. v. Kammeyer*, 581 S.W.2d 716, 721 (Tex.Civ.App.—Dallas 1979, no writ). Alvarado's suit was premised upon the deceptive trade practice,

to-wit: the representation made in the purchase agreement that the unit price or "true 'cash sale price'" of the car was $4,610.15. Tom Benson's points of error one through five relating to the legal insufficiency of the evidence are overruled. *See Oakes v. Guerra*, 603 S.W.2d 371, 374 (Tex. Civ.App.—Amarillo 1980, no writ).

■ Where factual insufficiency points of error are raised, such as "insufficient evidence" or "great weight," we are charged with examining all the evidence, including any evidence contrary to the findings of the jury to the special issues. If the evidence supporting the findings is so weak or the evidence to the contrary is so overwhelming that the findings should be set aside, then a new trial should be ordered; however, if the evidence does support the findings of the jury, then we must affirm the judgment. *See In re King's Estate*, 150 Tex. 662, 664–65, 244 S.W.2d 660, 661 (1951); O'Connor, *supra*; and Calvert, *supra*.

■ It is evident from the discussion, *supra*, that the evidence of the purchase agreement, the "window sticker" price, and the testimony of both Alvarado and the new car sales manager amply support the jury's findings. We overrule Tom Benson's points of error one through five which relate to the factual insufficiency of the evidence.

■ In the third issue raised by points of error one through five, appellant maintains that Alvarado failed to prove that Tom Benson was a "retail seller" pursuant to art. 5069–7.01(c) (Vernon 1968). Tom Benson argues that Alvarado failed to prove the appellant (1) was engaged in the business (2) of selling motor vehicles (3) to retail buyers who buy a motor vehicle other than principally for the purpose of resale (4) under a retail installment contract (5) for a sum consisting of the cash sale price and other charges as limited by Chapter 7 of the Texas Consumer Credit Code and (6) to

---

4. The GMC vehicle description is commonly referred to as the "window sticker" price. The sticker price of the Monza was $4,610.64, sub-

stantially the same as the purchase agreement price of $4,610.15.

those buyers who agree to pay part or all of such sum in one or more deferred installments. Specifically, Tom Benson argues that as a result of Alvarado's failure to "go beyond the transaction in question," Alvarado did not prove each essential element of the cause of action, citing as direct authority *Barfield v. Howard M. Smith Co. of Amarillo*, 426 S.W.2d 834, 838 (Tex.1968). *Barfield* does not stand for this proposition.

In *Barfield*, the appellant originally brought suit to recover sums of money allegedly due under a lease agreement. On appeal, the respondent maintained that the lower court, in findings of fact and conclusions of law, properly held that the appellant was equitably estopped from asserting the recovery claim under the lease agreement.

In the present case, Alvarado premised her cause of action, *inter alia*, upon the Texas Consumer Credit Code. Moreover, equitable estoppel was not plead by Tom Benson nor were there any special issues given with regard to an estoppel argument. Furthermore, *Barfield* would place proof requirements upon a consumer which are not mandated by the Texas Consumer Credit Code. *See Ford Motor Credit Co. v. Blocker*, 558 S.W.2d 493, 498 (Tex.Civ.App. —El Paso 1977, writ ref'd n.r.e.) [where a purchaser of a motor vehicle who promised to pay the cash price plus finance charges to a retail seller brought his transaction under the Texas Consumer Credit Code]. We overrule Tom Benson's points of error with regard to this issue.

■ In points of error six through nine, Tom Benson argues that Alvarado failed to prove that she was a "consumer" of services or service warranties furnished by Tom Benson in connection with the repair of the Chevrolet Monza. Tom Benson stresses that Alvarado, in order to become a "consumer" pursuant to Tex.Bus. & Com.Code Ann. § 17.45(4) (Vernon Supp. 1976–1977), must (1) seek or acquire services from Tom Benson and (2) purchase or seek to purchase services Tom Benson furnished in connection with the repair of the car, citing *Rutherford v. Whataburger, Inc.*, 601 S.W.2d

441, 444 (Tex.Civ.App.—Dallas 1980, writ ref'd n.r.e.). Tom Benson alleges that Alvarado failed to prove she was a "consumer" as to those services.

Tom Benson's points of error six through nine are wholly without merit. The record reflects that part of the "basis of the bargain," the inducement to the purchase of the car, was the warranty repair service. This warranty necessarily was part of the automobile purchase. The evidence shows that Alvarado obtained the written warranty from GMC in connection with the purchase of the car. Additionally, the repairs which were performed by Tom Benson were performed pursuant to a dealership agreement with GMC. Moreover, GMC paid Tom Benson for the completed warranty repairs to Alvarado's car. The evidence supports the finding implicit in special issue number 2 that Alvarado was a "consumer" of warranty repair service. Tom Benson's points of error six through nine are overruled.

■ Tom Benson, in point of error ten, asserts that special issue number two:

allows the jury to make its own determination as to whether Tom Benson Chevrolet committed any false, misleading or deceptive acts or practices or deceptive trade practices, without regard to whether the acts or omissions upon which the jury can hold Tom Benson Chevrolet liable have been raised by the pleadings and proof. Texas Rules of Civil Procedure 277 and 279 require the court to confine the broad single issue described in paragraph two of Rule 277 to issues raised by the written pleadings and the evidence.

Similarly, Tom Benson's point of error eleven states:

The court below erroneously overruled the seller's amended motion for new trial because the court erroneously overruled the seller's second objection to special issue number 2, which is: "Tom Benson Chevrolet (Seller) objects to the failure of the court to submit an issue or clusters of issues inquiring substantially as follows: Number One, [inquiring] whether or not an act or practice was false, misleading or

deceptive. Number Three, inquiring whether or not Tom Benson Chevrolet knowingly committed any false, misleading or deceptive acts. Number Four, inquiring whether or not any acts or practices committed by Tom Benson Chevrolet were a producing cause of any injuries or losses suffered by the plaintiff (Buyer)."

Alvarado alleged false, misleading and deceptive acts by Tom Benson and she alleged breach of warranty for merchantability. The evidence supports the jury's findings. Points of error ten and eleven are overruled.

■ Points of error twelve and thirteen assert that there is no evidence or, alternatively, insufficient evidence to support the finding that Tom Benson engaged in deceptive trade practices in connection with the sale, service or warranty of the automobile. Tom Benson argues that the jury's answer to special issue number 8 is controlling as to the jury's answer to special issue number 2 on the issue of sale.[5] We disagree. First, breach of warranty is defined in § 17.46 of the DTPA as a deceptive trade practice. As discussed *infra*, there is sufficient evidence to support the jury's finding of breach of warranty. Second, special issue number 8 is not dispositive of the deceptive trade practices special issue number 2 with regard to the sale of the car. Special issue number 8 relates to whether the responsibilities outlined in the express warranty given under the "new vehicle pre-delivery checklist" were performed. The finding in special issue number 2 is not "too general to support" the judgment in light of special issue number 8. Tom Benson's points of error twelve and thirteen are overruled.

■ Similarly, Tom Benson's fourteenth and fifteenth points of error, which claim that there is legally and factually insufficient evidence to support the special issue number 4e finding that the Monza was de-

fective at the time of delivery, are wholly without merit. Immediately following the purchase and delivery of the Monza, Alvarado experienced various mechanical difficulties with the car and returned it to Benson for warranty repair on several occasions. In particular, Alvarado complained of malfunctions in the steering mechanism and the air conditioning system. Alvarado testified that the car stalled in traffic and that she could not place the car in reverse gear. The record supports the jury's findings and points of error fourteen and fifteen are overruled.

In points of error sixteen and seventeen, Tom Benson alleges that there is legally and factually insufficient evidence to support the finding in special issue number 4b that Alvarado suffered physical pain and mental anguish as a result of a deceptive trade practice committed by Tom Benson. Alvarado testified that, on one occasion when the Monza stalled, she pushed the car, causing her to strain her back. She also stated that she experienced headaches and was constantly aggravated as a result of concern over the automobile.

■ Generally, while the anger, frustration and aggravation standing alone would not support an award of damages for mental anguish, *See Brown v. American Transfer & Storage Co.*, 601 S.W.2d 931, 938–939 (Tex.1980), we note that Tom Benson does not attempt to distinguish between the mental anguish which accompanied the physical injury for pushing the stalled car *and* the "mental anguish" for being sold a defective car which Tom Benson did not repair to Alvarado's satisfaction. Points of error sixteen and seventeen are overruled.

■ In its eighteenth point of error, Tom Benson argues that special issue number 4e and instructions thereunder regarding "diminished market value" of the car is not a controlling issue made by the plead-

---

5. Special issue number 8 states:

Question 8. Do you find from a preponderance of the evidence that Tom Benson Chevrolet failed to perform pre-delivery inspections and adjustments on Mary Esther Alvarado's 1978 Monza in a good and workmanlike manner?

Answer "Tom Benson failed" or "Tom Benson did not fail"

Answer: [Tom Benson did not fail]

ings and evidence. Tom Benson maintains that the appropriate measure of damages is the difference between the market value of the vehicle at the time and place of delivery and its market value if it had been delivered in the condition as warranted. Tom Benson notes that special issue number 4e does not relate to the time and place and acceptance, nor does it inquire about the difference in actual and warranted values. Consequently, Tom Benson reasons that the special issue is immaterial.

The record reflects that Tom Benson made no objection to the charge on this basis. As a result, such objection was waived. Tom Benson cannot now complain that the jury was permitted to find damages based upon an improper, a wrong or an immaterial instruction on the measure of damages. Tex.R.Civ.P. 272, 274; *Austin Olds-Cadillac and Toyota Co. v. Gaspard*, 592 S.W.2d 364, 366 (Tex.Civ.App.—Beaumont 1979, no writ); *United Postage Corp. v. Kammeyer*, 581 S.W.2d 716, 722 (Tex.Civ. App.—Dallas 1979, no writ) and the cases cited therein. *Cf. Carson v. Bryan*, 532 S.W.2d 711 (Tex.Civ.App.—Amarillo 1976, no writ) [where objection *was* made to the charge and the objection was held to be sufficient to preserve issue on appeal]. Tom Benson's eighteenth point of error is overruled.

Assuming *arguendo* that an objection had been made, was made timely and was sufficient to preserve the issue on appeal, Tom Benson suggests that Alvarado's testimony regarding the worth of the automobile to her is irrelevant to and does not support the jury's finding of $4,100.00 in diminished market value. We disagree.

It is well settled that the owner of property can testify as to his opinion of value of that property even though he could not be qualified to testify as an expert as to the value of the property owned by another person. *Classified Parking System v. Kirby*, 507 S.W.2d 586, 588 (Tex.Civ.App.— Houston [14th Dist.] 1974, no writ); *Barstow v. Jackson*, 429 S.W.2d 536, 538 (Tex. Civ.App.—San Antonio 1968, no writ). *See also Ford v. Texas Department of Public*

*Safety*, 590 S.W.2d 786, 787–788 (Tex.Civ. App.—Houston [14th Dist.] 1979, writ ref'd n.r.e.).

In *Kirby*, the owner of the car testified that, in his opinion, the value of the car to him was $3,500.00:

Q: Do you have an opinion as to the value of the car on the day it was stolen?

MR. RED: I object to that, your Honor.

THE COURT: Overrule the objection.

Q: (By Mr. Cage) Do you have an opinion?

A: To me the car *was worth* at least $3500.

Q: That is your opinion as to its value?

A: Yes, sir. [Emphasis added.]

507 S.W.2d at 587–588.

In the present case, the owner testified that the car was worth approximately $500.00 to her. Current case law does not require an owner to testify specifically as to the "reasonable market value" of a car in order to support a jury's finding on property value, which is supported by the owner's testimony of the car's worth. The testimony of Alvarado regarding the value of the car is sufficient to sustain the jury's finding in special issue number 4e. *Classified Parking System v. Kirby, supra; Barstow v. Jackson, supra*; 3 Wigmore on Evidence § 716 (3rd ed. 1940).

It is equally well settled that the qualifications of a witness to testify on the question of value are to be determined by the trial court, and the ruling of the court will not be disturbed on appeal unless it clearly reflects that it was wrong and, consequently, constitutes as abuse of discretion. *Chrysler-Plymouth City, Inc. v. Guerrero*, 620 S.W.2d 700, 704 (Tex.Civ.App.—San Antonio 1981, no writ); *Barstow v. Jackson, supra*. Tom Benson's points of error regarding this issue are overruled.

In its final point of error involving Alvarado, Tom Benson complains that Alvarado was erroneously awarded pre-judgment interest on an unliquidated demand. At trial, the time price differential was $1,077.98.

Pursuant to the applicable provisions of art. 5069–8.01 (Vernon Supp. 1976–1977), Alvarado was awarded damages in the amount of $2,155.96, which is double the time price differential. Additionally, Alvarado was awarded $7,705.00 in actual damages under the DTPA. Pursuant to Tex.Bus. & Com. Code Ann. § 17.50(b)(1) (Vernon Supp. 1973), the actual damages were trebled to result in a DTPA award of $23,115.00. The trial court totalled the time price differential damages with the DTPA damages and rendered a judgment in the sum of $25,270.96 with prejudgment interest from the date the cause of action arose, May 10, 1978, plus attorney's fees.

As has been noted, Alvarado is entitled to the entire $25,270.96. It is well settled that "where damages are established as of a definite time and the amount thereof definitely determinable, interest is recoverable as a matter of right *from the date of the injury or loss.*" [Emphasis added.] *Black Lake Pipe Line Co. v. Union Construction Co.*, 538 S.W.2d 80, 95–96 (Tex.1976). Thus Alvarado is entitled to prejudgment interest, from May 10, 1978, only upon the time price differential damages, $2,155.96, because those damages are definitely determinable. *See Exxon v. Middleton*, 613 S.W.2d 240, 242 (Tex.1981). With regard to the DTPA damages in the amount of $23,115.00, we reform the judgment to award interest from the date of judgment, May 19, 1980 at nine percent (9%) per annum.

Finally, Tom Benson complains of the trial court's overruling of its motion for judgment against GMC notwithstanding the jury's findings to certain special issues and entry of judgment for GMC on the cross-action for indemnity or contribution. By points of error twenty-two through thirty, Tom Benson attacks the jury findings to special issues six, ten, and eleven on the ground that they are not controlling or material issues so as to constitute a defense or that there is legally or factually insufficient evidence to support the findings. We overrule the evidentiary points. We agree that issues six, ten, and eleven are not controlling so as to constitute defenses to Tom Benson's cross-action for indemnity or contribution. If, however, those issues had never been submitted, Tom Benson would still not be entitled to a judgment on the cross-action. Tom Benson failed to submit issues and to obtain favorable answers thereto which would support a judgment for indemnity or contribution. Tom Benson therefore waived submission of the issues which might have entitled it to such relief against GMC. Tex.R.Civ.P. 279; *Washington v. Reliable Life Ins. Co.*, 581 S.W.2d 153 (Tex.1979). Consequently, we overrule Tom Benson's points of error dealing with the materiality of issues six, ten, and eleven.

Therefore, the judgment of the trial court is reformed only with regard to the award of prejudgment interest. In all other respects, the trial court is affirmed.

BASKIN, Justice, dissenting.

I concur in part and I dissent in part.

Alvarado alleged, and the jury found, that Tom Benson failed to set out the "true" cash price in the retail installment contract. The evidence showed that in the instrument introduced as plaintiff's exhibit 3 headed MOTOR VEHICLE RETAIL INSTALMENT CONTRACT—SECURITY AGREEMENT AND FEDERAL TRUTH–IN–LENDING DISCLOSURE STATEMENT the cash price was shown to be $4,756.52 and, after subtracting the total down payment plus trade-in, insurance, fees, taxes, license and registration fees and certificate of title fee, the unpaid balance was $4,309.36. This document was executed by Alvarado and by Tom Benson's business manager. An additional instrument, to which Benson timely objected, was entitled "Purchase Agreement," which was signed by Alvarado but was not signed by anyone at Tom Benson Chevrolet. It showed a "unit price" of $4,610.15; and with reduction for license fees, trade-in allowance and the like, the balance due would be $4,393.45.

The jury found in answer to special issue no. 1 that Tom Benson failed to state the "true cash sale price" in the retail installment contract entered into with Mary Esther Alvarado.[1] The trial court entered judgment for double the amount of the time price differential in this cause of action. The time price differential is shown on plaintiff's exhibit 3, the MOTOR VEHICLE RETAIL INSTALMENT CONTRACT—SECURITY AGREEMENT AND FEDERAL TRUTH–IN–LENDING DISCLOSURE STATEMENT, as "FINANCE CHARGE", in the amount of $1,077.98. Double that amount is $2,155.96.

By its first two points of error, Tom Benson avers that there was no evidence or insufficient evidence to support the jury's finding to special issue no. 1. By its third point of error, Tom Benson says that the trial court erred in admitting plaintiff's exhibit 1, an instrument called Buyer's Purchase Order, over Tom Benson's objection that admission of the instrument violated the parol evidence rule and that buyer failed to prove that the seller executed that instrument.

I would sustain appellant's third point of error. The parol evidence rule, which is a substantive rule of law and not a rule of evidence, prevented the purchase order from being introduced or being considered as an agreement by the parties on the case sale price; and whatever agreement there might have been with regard to the purchase order, it merged into the retail installment contract. *Hubacek v. Ennis State Bank*, 159 Tex. 166, 317 S.W.2d 30, 32 (Tex. 1958). If it be concluded that the purchase order was a contract,[2] it was obviously in conflict with the provisions of the MOTOR VEHICLE RETAIL INSTALMENT CONTRACT—SECURITY AGREEMENT AND FEDERAL TRUTH–IN–LENDING DISCLOSURE STATEMENT as regards the case sale price. Where two contracts are by their terms inconsistent, the one later made is conclusively presumed to supersede the other. *Willeke v. Bailey*, 144 Tex. 157, 189 S.W.2d 477 (1945); *Ed Hoffman Motors v. G. F. C. Corporation*, 304 S.W.2d 216 (Tex. Civ.App.—San Antonio 1957, writ ref'd n.r. e.). Therefore, while the trial court should have sustained Tom Benson's objection to the tender into evidence of the purchase order, the result is the same. Parol evidence may not be used to vary the terms of the MOTOR VEHICLE RETAIL INSTALMENT CONTRACT.

---

1. Answers to Special Issues were as follows:

# 1. Benson failed to state the true cash sale price in the retail installment contract entered into with Mary Esther Alvarado.

# 2. Benson engaged in deceptive trade practices in connection with the sale, service and warranty of the automobile in question.

# 3. Such deceptive trade practices were a producing cause of adverse effects upon Mary Esther Alvarado.

# 4. The sum of money which would fairly and reasonably compensate Mary Esther Alvarado for damages resulting from the deceptive trade practices of Benson were: (a) Medical expenses, $75,000; (b) physical pain and mental anguish, $3,000; (c) loss of use of automobile, $330; (d) loss of wages, $200; (e) diminished market value, $4,100.

# 4A. The reasonable attorney's fees for Mary Esther Alvarado's attorneys were: (a) preparation and trial, $7,300; (b) for appeal to the Court of Civil Appeals, $2,500; (c) for appeal to Supreme Court of Texas, $5,000; (d) for additional work in connection with any appeal of the Supreme Court of Texas, if writ of error should be granted, $1,500.

# 5. Mary Esther Alvarado received the 1978 Monza on or about May 10, 1978, from Benson in substantially the same condition that Benson received it from General Motors.

# 6. Benson failed to perform all required service on the 1978 Monza in question in good and workmanlike manner.

# 7. Benson's failure to perform all required service on the 1978 Monza in question in a good and workmanlike manner was a producing cause of Mary Esther Alvarado's damages.

# 8. Benson did not fail to perform pre-delivery inspections and adjustment on Mary Esther Alvarado's 1978 Monza in a good and workmanlike manner.

# 10. General Motors Corporation received no written notice of Benson's complaint before May 23, 1979.

# 11. General Motors was not given a reasonable opportunity by Benson to cure the defects or the malfunctions in the 1978 Monzas automobile in question before May 23, 1979.

2. The purchase order was signed by Alvarado but not by Tom Benson.

The majority opinion argues that the purchase order agreement was admissible to show the price the buyer would have paid to the seller. The parol evidence rule and the rule regarding merger finally and conclusively require that we look to the MOTOR VEHICLE RETAIL INSTALMENT CONTRACT for the determination of what the buyer would have paid and did pay the seller.

If I am correct that the doctrine of merger and the parol evidence rule govern, then it goes without argument that points of error 1 and 2 asserting no evidence or insufficient evidence to support the jury's finding to special issue 1 must be sustained. They should be sustained independently as well.

Article 5069–7.02(6)(a) requires that the retail installment contract shall set out the "cash price as defined in art. 7.01." Article 5069–7.01 contains the following definition:

> (f) "Cash Sale Price" means the price *stated in a retail installment contract* for which the seller would have sold to the buyer and the buyer would have bought from the seller, the motor vehicle which is the subject matter of such contract if such sale had been a sale for cash. The cash sale price may include any taxes, registration, certificate of title and license fees, and charges for delivering, servicing, repairing, altering or improving the motor vehicle. (Emphasis supplied.)

The retail installment contract, as defined in the Consumer Credit Act, did contain the cash sale price as defined in the Act.

A consideration of the legislative intent in enacting the Consumer Credit Act is helpful in understanding why there was no evidence or insufficient evidence to support the finding of the jury to special issue no. 1. Legislative intent is to be determined from the entire statute and the statute is to be construed so as to give effect to the purpose of the legislature. *Citizens Bank of Bryan v. First State Bank*, 580 S.W.2d 344 (Tex. 1979); *Flowers v. Dempsey-Tegeler & Co.*, 472 S.W.2d 112 (Tex.1971). It is also held that it is the duty of the court to give a statute a reasonable construction consistent with general principles of law and where an adherence to the strict letter of the statute would lead to injustice or absurdity, the duty devolves on the court to ascertain the true meaning consistent with the purposes to be accomplished. *Knight v. Hicks*, 505 S.W.2d 638 (Tex.Civ.App.—Amarillo 1974, writ ref'd n.r.e.).

The purpose of the Texas Consumer Credit Act and particularly of the Motor Vehicle Instalment Sales Act, is to protect consumers from abusive and deceptive practices in the extension of credit. This is borne out by the determination of the legislature to impose a penalty of double the amount of the time price differential for violation of the provisions of the Act. As this court held in *O. R. Mitchell Motors, Inc. v. Bell*, 528 S.W.2d 856, 860 (Tex.Civ.App.—San Antonio 1974, writ ref'd n.r.e.), the purpose of art. 5069–7.02 was to impose duties on sellers who in the ordinary course of business present to a buyer a document ready for the buyer's signature.

In this case Tom Benson presented to Alvarado a document ready for the buyer's signature; and the buyer signed it. It was the only contract of sale into which both of the parties entered.

In my opinion Tom Benson did not violate the Consumer Credit Code but instead complied with it. Therefore there was no evidence or alternatively insufficient evidence to support the jury's finding on special issue no. 1.

Since the finding on special issue no. 1 cannot stand, the judgment should be reduced by the amount of $2,155.96, or double the amount of the time price differential found in the installment contract.

Point of error 18 attacks special issue 4e and instructions thereunder on the ground that the "diminished market value" of the automobile is not a controlling issue made by the pleadings and the evidence. Tom Benson says that the appropriate measure of damages and hence the controlling issue is the difference between the market value of the vehicle at the time and place of

delivery and its market value if it had been delivered in the condition as warranted.

"Actual damages" under the Deceptive Trade Practices Act are those recoverable at common law." *Brown v. American Transfer & Storage Co.*, 601 S.W.2d 931 (Tex.1980). The correct measure of damages is the difference between the amount paid and the fair market of the automobile as delivered to plaintiff. *Sobel v. Jenkins*, 477 S.W.2d 863 (Tex.1972); *Scholtz v. Sigel*, 601 S.W.2d 516 (Tex.Civ.App.—Dallas 1980, no writ). However, I can find no indication in the record that Tom Benson objected to the form of special issue 4e. The objection is therefore waived, and point of error 18 is appropriately overruled. Notwithstanding, the jury's answer to special issue 4e may not stand.

In points of error 19c and 20e, Tom Benson claims that there is no evidence or insufficient evidence to support the jury finding in answer to special issue 4e of $4,100.00 as the amount of money which would reasonably compensate plaintiff for the "diminished market value" of the automobile. The evidence does not support the jury's finding of $4,100.00 in diminished market value.

An expert witness call by Alvarado testified that the fair market value of Alvarado's car in San Antonio, Bexar County, Texas, in May of 1978 with defects was not more than $2,000.00. Tom Benson's sales manager testified that the fair market value of Alvarado's car in Bexar County, Texas, in May 1978 was approximately $4,500.00.

The *only* evidence to support the jury's finding of $4,100.00 diminution in value of the car, was plaintiff's own testimony as follows:

"Q: O.K. Then having looked around, Mary Esther, at used cars and new cars and prices, having become aware of the prices of used and new cars, if you had known of the defects that that car had, what would that car be worth in Bexar County, Texas?

A: To me, about $500.00."

This is the only testimony in the record upon which the jury could have reached its verdict that the "diminished market value, if any, of the automobile in question as a result of any defects *at the time of delivery*" was $4,100.00. (Emphasis added.)

The plaintiff testified as to what the car was worth *to her* rather than the reasonable market value of the car at the time and place of its purchase. Such a measure of damages can be utilized only in special situations. In *International-Great Northern Railroad Co. v. Casey*, 46 S.W.2d 669, at 670 (Tex.Comm'n App.1932), Judge Sharp wrote:

"The rule is settled that, where property is destroyed or injured, which has a market value, this must be shown by the owner as the measure of damages; where it has neither a market value nor a real value, but it is shown what it would cost to replace or reproduce the article, then such cost is the measure of recovery. Where it has neither a market value nor a real value, and it cannot be reproduced or replaced, then in that event it would be proper to show what it was worth to the owner."

The record here contains no evidence of the market value of plaintiff's car which would support the verdict of $4,100.00 "diminution in value." Plaintiff's testimony that the car, *to her*, was worth only $500.00 would have been appropriate only after it had been established that the car had no market value and could not be reproduced or replaced. *Allis-Chalmers Manufacturing Co. v. Board*, 118 S.W.2d 996 (Tex.Civ.App.—Amarillo 1938, no writ). I would hold that there is no evidence or insufficient evidence to support the jury's finding on special issue number 4e. I would sustain points of error 19c and 20e for these reasons. As a result, the amount of the judgment should be reduced by treble the jury's finding of $4,100.00 or $12,300.00.

Tom Benson's point of error number twenty-one asserts that the trial court erred by awarding prejudgment interest on an unliquidated amount. Prejudgment interest is recoverable when damages are estab-

lished at a definite time and the amount of damages is definitely determinable. *Black Lake Pipe Line Co. v. Union Construction Co. Inc.*, 538 S.W.2d 80, 95–96 (Tex.1976). Here, where the amount of damages was not definitely determinable, prejudgment interest is not recoverable. *Exxon Corp. v. Middleton*, 613 S.W.2d 240, 252 (Tex.1981).

The majority agrees except that they maintain that prejudgment interest was appropriately recoverable on the amount of money awarded for double the amount of the time price differential in connection with the answer of the jury to special issue no. 1. I have already expressed the opinion that the granting of this penalty by the trial court was error. If I am correct in that assertion, then of course there will be no interest on that amount, but even if I am incorrect, there still should be no prejudgment interest. The award of double the amount of the time price differential under the Consumer Credit Act was a penalty and not damages. Penalties do not draw prejudgment interest because a penalty does not reflect damage to the plaintiff. Penalties are assessed to discourage certain conduct on the part of the party penalized. As the Court of Appeals for the Fifth Circuit has said, "interest on a penalty does not further the purpose of making an injured party whole." *Illinois Central Railroad Company v. Texas Eastern Transmission Corp.*, 533 F.2d 272 (5th Cir. 1976) *aff'd in part, rev'd in part,* 551 F.2d 943 (5th Cir. 1977).

For the reasons stated above, I would reform the judgment by reducing the money award of $25,270.96 to $10,815.00 and by awarding interest on that amount from the date of judgment, May 19, 1980, and, as reformed, I would affirm the judgment.