**FIDELITY & CASUALTY COMPANY OF NEW YORK, Appellant,**

v.

**A.H. UNDERWOOD d/b/a Lakeside Veterinary Clinic, Appellee.**

**No. 05–89–01025–CV.**

Court of Appeals of Texas, Dallas.

June 15, 1990.

**638**

Mark J. Carroll, Dallas, for appellant.

Bill Reed, Woodall Westerbeck & Reed, Rockwall, for appellee.

Before ENOCH, C.J., and BISSETT[1] and CHADICK[2], JJ.

1. The Honorable Gerald T. Bissett, Justice, Retired, Court of Appeals, Thirteenth District of Texas at Corpus Christi, sitting by assignment.

## OPINION

ENOCH, Chief Justice.

The Fidelity & Casualty Company of New York (Fidelity) appeals from the trial court's order granting judgment for Archie H. Underwood d/b/a Lakeside Veterinary Clinic (Underwood) on his claims against Fidelity for breach of contract, violation of the Texas Deceptive Trade Practices Act (DTPA), and violation of the Texas Insurance Code. Fidelity claims the trial court erred in failing to grant an instructed verdict, in submitting issues to the jury on the above stated causes of action, and in failing to grant judgment notwithstanding the verdict because there is no evidence or factually insufficient evidence to support any of these causes of action. Fidelity also argues that some of the jury questions are "duplicitous" and invite the jury to "speculate" and "surmise" and that these are errors requiring reversal. Fidelity also seeks reversal of any award of attorney fees. We affirm the trial court's judgment.

Underwood purchased a new GMC pickup truck on August 18, 1986. The total cost of the vehicle was $11,786.15. Shortly thereafter, the truck was stolen, abandoned and found with its front end submerged in the lake. The water came up to the level of the headlights, and the cab had water up above the floor boards. The testimony on how long the truck was submerged in the lake varied from twenty-four hours up to five or six days. The Dallas Police Department recovered the vehicle. Underwood had the vehicle released by the Police Department and, under instructions from Fidelity, had it taken to a salvage pool. Once there, Fidelity's appraiser determined that the vehicle was repairable, and the vehicle was then moved to Musser Motors, Inc., to have the repair work done. The testimony suggests that Fidelity unilaterally changed its position on whether the truck was repairable four times within a few days. In any event, within thirty days of when the truck was found, Fidelity tendered a check for $3,509.08 to Underwood as complete

2. The Honorable T.C. Chadick, Justice, Retired, Supreme Court of Texas, sitting by assignment.

satisfaction of his claim. At the time the check was tendered, Fidelity knew that the claim was in dispute and that Underwood did not want the truck repaired because he felt that the truck could not be restored to its original condition. Underwood therefore refused to accept this check. Fidelity did not return Underwood's calls or calls made by Underwood's attorney. The testimony established that once the check was tendered, Fidelity failed to communicate further with Underwood or his attorney despite knowing that the claim was still in di Fidelity maintained that the contract of insurance provided it with the option of repairing the truck in this situation. The record indicates that other options under the contract of insurance were not considered or discussed with Underwood. Notice under the DTPA was sent to Fidelity and this lawsuit ensued. TEX.BUS. & COM. CODE ANN. § 17.505 (Vernon 1987), (current version at TEX.BUS. & COM.CODE ANN. § 17.505 (Vernon Supp.1990)).

The case was submitted to the jury on contract issues and issues inquiring as to violations of the DTPA and the Insurance Code. The jury answered all of the questions in favor of Underwood. The judgment was rendered in favor of Underwood on his DTPA and Insurance Code cause of action for $64,887.00 plus attorney fees at trial and on appeal. Fidelity brings points of error attacking the submission to the jury of both the contract issues and the DTPA and Insurance Code issues because there is no evidence to support the submission of these issues. We will address the contract issues first and then discuss Fidelity's claims as they relate to the DTPA and Insurance Code violations.

■ In its first point of error, Fidelity argues that the trial court erred in overruling its motion for instructed verdict and for judgment notwithstanding the verdict because there is no evidence of the market value of Underwood's vehicle immediately prior to the loss. When reviewing a "no evidence" challenge, an appellate court must only consider the evidence and reasonable inferences drawn therefrom, which, when viewed in their most favorable

light, support the jury verdict or court finding. The court must disregard all evidence and inferences to the contrary of the fact finding. *Stafford v. Stafford,* 726 S.W.2d 14, 16 (Tex.1987); *Alm v. Aluminum Co. of America,* 717 S.W.2d 588, 593 (Tex. 1986).

The record in the instant case is replete with evidence of market value prior to the loss. The truck was essentially a brand new vehicle with less than 700 miles on it. The contract of sale between Underwood and Musser Motors, Inc., was admitted into evidence showing the total cost of the truck to be $11,786.15. Pat Grady, an expert in the valuation of new and used vehicles as well as flood-damaged vehicles such as Underwood's, testified on direct examination as follows:

Q I'd like for you to assume we're talking about a brand new, right-off-the-lot truck that had been driven by one owner, the original purchaser. He'd driven it for a period of about six weeks, and it had been registered to him, or was in the process to being registered to him.

A I'd say somewhere in the neighborhood of ten thousand.

Q Okay. So there'd be some measure of decrease in value from the time that this truck was purchased originally and the time that—six weeks later?

A That's correct.

Q How do you arrive at the amount of that depreciation when you're talking about the value of this truck to the owner?

A That's always a hard question to answer. Normally speaking, and seven hundred miles is not a normal situation. You normally are looking at depreciation from fifteen to twenty cents a mile, so if you had a vehicle with twenty thousand miles on it, it would probably have depreciated anywhere from three thousand to four thousand dollars.

And I think most people will agree somewhere in the neighborhood to fifteen cents to twenty cents a mile is what a vehicle will depreciate.

Q So if this vehicle had, say, seven hundred miles on it total—

A Um-hum.

Q —times twenty cents a mile, then would you decrease the value of that truck by a hundred and forty dollars?

A Seven hundred miles is so unusual, you cannot use those kinds of rule of thumb because you have to have the difference between a new vehicle and a used vehicle and so you just don't see many seven hundred mile vehicles at all, so normally speaking a seven hundred mile vehicle would depreciate about a thousand dollars.

Q And that's for purposes of selling it to someone else?

A That's correct.

\* \* \* \* \* \*

Q ... If you bought a brand new 1986 GMC truck of the same description I previously made, you drove it about six hundred miles. Say you paid ten thousand seven hundred dollars for it, just roughly—

A Okay.

Q —and say you lost that vehicle or it was stolen from you six weeks later, what would you consider the value of this hypothetical vehicle to be to you after seven hundred miles of driving?

A Well, normally a vehicle will not depreciate over twenty cents a mile.

Q So you'd multiply twenty cents a mile times seven hundred miles?

A That's correct.

Q You'd take one hundred forty dollars off the price?

A That's correct.

Fidelity argues that when Pat Grady testified to the pre-loss value of this vehicle, he was testifying to the subjective value of this vehicle to him personally and not to its market value. This contention is without merit. Pat Grady testified that he was the owner of Lakeside Chevrolet in Rockwall and that he was familiar with the value of new, used and flood damaged vehicles. His expert testimony was offered on the value of this vehicle prior to its theft. The testimony was of the market value of the vehicle in the case at bar and was not a statement of some other subjective value. If there is more than a scintilla of evidence

to support the finding, the no evidence challenge fails. *Stafford,* 726 S.W.2d at 16. Since we have determined that the testimony of Pat Grady is competent on this issue and amply supports submission of this issue to the jury, we overrule Fidelity's first point of error.

■ In its second point of error Fidelity argues that the trial court erred in overruling its motion for instructed verdict and for judgment notwithstanding the verdict because there was no evidence of the market value of Underwood's truck immediately after the loss but in a repaired condition. In essence, Fidelity argues that Underwood must establish (1) the market value before the occurrence giving rise to the loss; (2) the market value immediately after the occurrence and before the repairs; (3) the cost of repairs; (4) and the market value if the repairs had been made so the court can determine whether, under the policy, the vehicle can be restored to substantially the same value as immediately prior to the loss. *Northwestern Nat'l Ins. Co. v. Cope,* 448 S.W.2d 717, 719 (Tex.Civ.App.—Corpus Christi 1969, no writ). Fidelity argues that there is no evidence of the market value of the repaired vehicle so as to determine whether it is of substantially the same value as that of the vehicle prior to the loss.

Once again the record demonstrates that the value of the vehicle after repairs is not substantially the same as that of the vehicle prior to the loss. There is testimony in the record that flood damaged vehicles must be so noted on the title and that such vehicles do not command the same market price after repairs as non-flood damaged vehicles. Pat Grady on redirect examination testified:

Q All right. Now, if now we're going to compare apples to apples in the sense that if I ask you to compare the equal cash value to you of that seven hundred mile flood-damages vehicle we've been talking about, against an undamaged vehicle having the same number of miles, what would the difference be, if any?

I guess the bottom line is, what effect would the flood damage have on the equal cash value of the same truck?

A The majority of flood damaged vehicles are sold through the auction or through sold at [sic] salvage pools or sold directly by insurance companies, and that's a matter—it's a very difficult question to answer, but it—because it depends on who's buying it and what they're going to do with it and all, *but I would tend to think that if you had a ten, eleven thousand dollar vehicle and you were selling it as a flood-damaged car just like it sits through the salvage pool and all, it would probably bring around thirty-five hundred.*

Q *Okay and that's compared to the same eleven thousand dollar vehicle if it had not been flood damaged?*

A *That's correct.*

Q *So it would have lost about sixty-six percent of its salability value?*

A *That is correct. Generally speaking. We're just—I haven't seen the vehicle, so I cannot say exactly, but generally speaking and all, vehicles would depreciate somewhere in that amount when they're sold through the salvage pool as flood-damaged vehicles.*

(Emphasis added.) There was a great deal of testimony indicating that flood damaged vehicles will develop other mechanical problems that do not show up upon initial inspection. The evidence establishes that such vehicles are less reliable and need more frequent repairs. This evidence suggests that the post-repair value of the vehicle would not be substantially the same as the vehicle's pre-loss value. Once again if there is any evidence to support the finding the no evidence challenge fails. *Stafford,* 726 S.W.2d at 16. Fidelity's second point of error is overruled.

■ Fidelity, in its third point of error, argues that the trial court erred in overruling its motion for instructed verdict and for judgment notwithstanding the verdict because there was no evidence of the market value of Underwood's vehicle immediately after the loss. Once again the record simply does not substantiate this claim. In essence, Fidelity rephrases its argument under its first two points of error. It argues that Underwood's testimony concerning the post-loss, pre-repair value of his flood-damaged vehicle is not competent on this issue. On direct examination Underwood testified as follows:

Q Okay. As a result of the occurrences in this lawsuit, *have you undertaken to learn from anyone what the consequences of flood damage are to a vehicle?*

[COUNSEL]: I'm not asking him to testify as to what he's learned yet, Your Honor. I'm asking if he has learned any information concerning that.

A (By the witness) *Yes.*

Q And in response to the information you have heard, what has been your decision on that matter?

A That I don't want one.

Q Under any circumstances, would you want a flood damaged vehicle?

A No.

Q Are you aware of any laws that deal with the permanent notation on title of a flood damaged vehicle?

A I've been told they have to be stamped as a flood damaged vehicle.

Q Okay. And have you ever attempted to buy or sell a flood damaged vehicle?

A No.

On redirect, Underwood testified as follows:

Q Dr. Underwood, would you tell the jury the actual cash value of this truck to you on the day that the vehicle was stolen, before it was stolen.

A Actual cash value?

Q Yes.

A Probably around $10,500.

Q *And will you tell the jury the actual cash value of this vehicle to you after the flood damage occurred?*

A *Nothing, 0.*

In Texas, the owner of property can testify to its market value, even if he could not qualify to testify about the value of like property belonging to someone else. *Porras v. Craig,* 675 S.W.2d 503, 504 (Tex. 1984); *Tom Benson Chevrolet, Inc. v. Alvarado,* 636 S.W.2d 815, 823 (Tex.App.—San Antonio 1982, writ ref'd n.r.e.). If the

owner of real property has an opinion, he may testify as to the value of the property owned by him. *Blackmon v. Mixson*, 755 S.W.2d 179, 182 (Tex.App.—Dallas 1988, no writ); *Alvarado*, 636 S.W.2d at 823. In *Porras*, the Texas Supreme Court noted that when Craig testified as to the value of the property, he was stating an intrinsic or personal value of the property and not the market value. *Porras*, 675 S.W.2d at 505. The Court held that this testimony was irrelevant on the issue of market value and sustained the no evidence point. *Id.*

■ The key determination to be made by the court in this matter is whether the owner is testifying to market value or intrinsic value. *See Pontiac v. Elliott*, 775 S.W.2d 395, 599 (Tex.App.—Houston [1st Dist.] 1989, writ denied); *River Oaks Townhomes Owners' Ass'n, Inc. v. Bunt*, 712 S.W.2d 529, 933 (Tex.App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.); *Powell–Buick–Pontiac GMC, Inc. v. Bowers*, 718 S.W.2d 12, 15 (Tex.App.—Tyler 1986, writ ref'd n.r.e.). The testimony shows that Underwood was testifying to matters within his knowledge. Underwood's testimony has probative value on the issue of market value. *See Hochheim Prairie Farm Mut. Ins. v. Burnett*, 698 S.W.2d 271, 275–76 (Tex.App.—Fort Worth 1985, no writ); *Bunt*, 712 S.W.2d at 533; *Alvarado*, 636 S.W.2d at 823.

■ Pat Grady, the owner of Mussen Motors, Inc., testified that he would not drive a flood damaged vehicle. He testified that if the same flood damage had occurred to a vehicle on his lot, such a vehicle would not be sold to the public even after repairs. He testified as follows:

A Let me tell you what General Motors would determine to be a flood-damaged vehicle, if it were a new vehicle, okay? And their perspective may be a little different than other people. They will not sell a flood-damaged vehicle.

*If we have a vehicle off our lot, and we have rising water to where water gets into the transmission, the rear end of the vehicle, and all we're insured by*

*a part of General Motors, and they will basically not retail those vehicles because of the liability down the road and all.*

*They will either crush those vehicles or give them to a school for someone in auto mechanics,* so any vehicle that sustains rising water where it gets in the vehicle, physically inside the vehicle, for over twenty-four hours, they will not allow a dealer to sell as a new vehicle. Now, that is General Motor's policy.

(Emphasis added.) Pat Grady also testified that such vehicles may be sold through a salvage pool and may have some value in that sense.

Edwin Kurth, who testified as an expert witness for Underwood, stated that such vehicles do have a salvage value when sold through a salvage pool, but he did not state an amount as to what such vehicles are worth. In reviewing a no evidence point, if there is more than a scintilla of evidence to support the finding, the no evidence challenge fails. *Stafford*, 726 S.W.2d at 16; *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex.1983). The evidence discussed above has probative value on the issue of post-loss, pre-repair market value. Fidelity's third point of error is overruled.

■ In its fourth point of error, Fidelity argues that the trial court erred in submitting jury question number one, inquiring whether Fidelity had breached any of the material obligations of the insurance policy, because it is an improper issue in this insurance case and "duplicitous." We note that Fidelity has failed to cite any authority for this proposition[3] or explain how this charge is "duplicitous." The point of error suggests that jury question number one is improper because there is no evidence to support the conclusion that Fidelity breached any of the material obligations of the insurance contract. Fidelity does not explain its point of error further.

The insurance coverage for this type of loss was not in dispute. In the event of loss or damage, Fidelity's liability to Un-

---

**3.** Under *Inpetco, Inc. v. Texas American Bank/Houston*, 729 S.W.2d 300, 300 (Tex.1987),

failure to cite authority no longer constitutes waiver of the point of error.

derwood under the contract is set out as follows:

## II. LIMIT OF LIABILITY

The limit of the company's liability for loss to any one covered automobile shall not exceed the least of the following amount:

(a) the actual cash value of such covered automobile, or if the loss is to a part thereof the actual cash value of such part, at time of loss; or

(b) what it would then cost to repair or replace such covered automobile or part thereof with other of *like kind and quality*, with deduction for depreciation; or

(c) the limit of liability stated in the schedule as applicable to "each covered automobile" under the coverage afforded for the loss to such covered automobile, provided that if such limit of liability is expressed as a stated amount it shall, with respect to a covered automobile newly acquired during the policy period and not described in the schedule, be deemed as having been replaced by "actual cash value."

(Emphasis added.) Fidelity argues that under the contract of insurance it was obligated to pay the lesser of the cost to repair or restore the vehicle to substantially the same value as prior to the loss, or the market value of the vehicle immediately prior to the loss. It is undisputed that Fidelity never offered to pay the market value of the vehicle prior to the loss. Fidelity instead maintained that the vehicle was repairable and that the vehicle as repaired would have substantially the same value as the vehicle prior to the loss. As discussed under points of error one through three, there is evidence supporting a jury finding that the market value of the vehicle prior to the loss was $10,000 and that the value of the vehicle in a repaired condition, after the loss, would be $3,500. The evidence indicated that flood-damaged vehicles develop many problems which do not show up on initial inspection; that such vehicles are unreliable; and that the extent of needed repairs exceeded those proposed by Fidelity. The record indicates that once the vehicle is restored it will not be of substantially the same value as that of the vehicle prior to the loss. Therefore, there is evidence that Fidelity failed to perform that which it was contractually obligated to do.

Under point of error four, Fidelity also argues that jury question number one is unduly vague and invites the jury to "speculate" and "surmise." We note that under rule 277 of the Texas Rules of Civil Procedure such a broad form submission is proper. *Brown v. American Transfer & Storage Co.*, 601 S.W.2d 931, 937 (Tex.), cert. denied, 449 U.S. 1015, 101 S.Ct. 575, 66 L.Ed.2d 474 (1980); *Line Enterprises v. Hooks & Matteson*, 659 S.W.2d 113, 116–17 (Tex.App.—Amarillo 1983, no writ); Tex.R. Civ.P. 277. The form of submission is also within the sound discretion of the trial court. *Jacobs v. Jacobs*, 670 S.W.2d 312, 313 (Tex.App.—Texarkana 1984, writ ref'd n.r.e.). The issue presented in jury question number one was raised by the pleadings and supported by the evidence. The question asked the jury to decide a disputed issue in the case and supplied the jury with a definition of "material" as used in the charge and as it relates to obligations under the insurance policy. The question is not unduly vague, and does not invite the jury to "speculate" and "surmise."

Fidelity further argues that jury question number one is "duplicitous" of jury questions numbers four, four(a), five, and six. Jury question number four inquires as to the cost of repairs to Underwood's vehicle. Jury question number four(a) asks the jury to determine the market value of the vehicle prior to the loss. Jury question number five asks the jury to determine the value of the vehicle after repairs. Jury question number six asks the jury to decide the value of the damaged vehicle before the repairs. Fidelity does not explain how jury question number one is "duplicitous" of jury questions numbers four, four(a), five and six. We assume that Fidelity argues that jury question number one asks "generally" what questions four, four(a), five and six ask combined. Fidelity

does not explain how it was harmed by this submission if indeed it is "duplicitous." We have reviewed the issues presented and can find no variance in the answers given. This argument does not present reversible error. *See First Employees Ins. Co. v. Skinner,* 646 S.W.2d 170, 172 (Tex.1983); TEX.R.APP.P. 81(b)(1). Fidelity's fourth point of error is overruled.

In point of error five, Fidelity argues that the trial court committed error in submitting jury question number two, inquiring as to the amount of Underwood's damages under the insurance policy, because it is an improper issue and "duplicitous." Once again Fidelity cites no authority under the arguments on which it seeks reversal.

■ Fidelity claims that jury question number two "does not properly place Underwood's burden of proof." Jury question number two, including instructions, reads as follows:

JURY QUESTION NO. 2

Find from a prepondence [sic] of the evidence the amount of Dr. Underwood's damages, if any, under the insurance policy.

Answer: In Dollars and cents or "none"

Answer: $10,500.00

In determining Dr. Underwood's actual damages, under the insurance policy, if any, you are instructed to include ony [sic] those amount(s), if any, to which Dr. Underwood is entitled by virtue of the terms of the policy itself.

Do not consider any amounts for elements of Dr. Underwood's damages, if any unless the Fidelity and Casualty Company of New York is obligated to pay for same under the terms of the insurance policy.

As the question is written, it uses the proper burden of proof, and it is clear that that burden is placed on Underwood. The jury instructions explain the term "preponderance of the evidence." During voir dire, the jury was also told who had the burden of proof in this case. The burden of proof was also discussed again during closing argument.

■ Fidelity also argues that the amount found in jury question number two conflicts with the amount found by the jury in question number eleven. We note that jury question number eleven dealt with Underwood's claim under the DTPA and was not limited to a contractual amount of damages. Jury question number two specifically limits the jury's consideration of damages to those under the contract of insurance. These are separate causes of action requiring different kinds of proof. Not all contract claims are DTPA claims. *Honeywell v. Imperial Condominium Ass'n,* 716 S.W.2d 75, 78 (Tex.App.—Dallas 1986, no writ). The submission of both questions is proper since they are both raised by the pleadings and evidence introduced at trial. *See Rocha v. Ahmad,* 676 S.W.2d 149, 158 (Tex.App.—San Antonio 1984, no writ); *Neuhaus v. Kain,* 557 S.W.2d 125, 135 (Tex.Civ.App.—Corpus Christi 1977, writ ref'd n.r.e.).

Under point of error five, Fidelity further contends that jury question number two is "duplicitous" of questions four, four(a), five and six. Again Fidelity does not construct any argument for this proposition. We have considered this point of error. It is without merit. Fidelity's fifth point of error is overruled.

■ In point of error six, Fidelity argues that jury question number three is improper. Jury question number three asked the jury to determine whether the vehicle was a "total loss." The jury was instructed that in order to find the vehicle a total loss they must find that, under the policy, the vehicle cannot be restored by repairs to the condition and value it had prior to the loss. Fidelity argues that only the questions dealing with the relative market values of the vehicle should have been asked and that jury question number three should not have been asked. Fidelity cites *Agricultural Workers Mut. Auto Ins. Co. v. Dawson,* 424 S.W.2d 643 (Tex.Civ.App.—Tyler 1968, no writ). To the contrary, the Tyler court indicates that, when there is contradictory evidence in the record, asking the jury to find the market value of the vehicle before and after the loss without

also asking the jury whether the vehicle is a "total loss" is error. *Dawson*, 424 S.W.2d at 644–55. Fidelity's sixth point of error is overruled.

█ In point of error seven, Fidelity argues that the trial court erred in overruling its motion to disregard the answer to jury question number four because there was no evidence to support the jury's answer. Jury question number four asked the jury to determine the cost of repairing Underwood's vehicle. The jury found that the amount of needed repairs was $10,500. Without citing any authority, Fidelity argues that the only competent evidence presented at trial established that the cost of repairs was $3,509.00. The record indicates that $3,509 is the amount of money tendered by Fidelity to Underwood to repair the vehicle. However, there was evidence presented at trial that Underwood's vehicle would need more repairs than those presented in Fidelity's estimate. The evidence established that flood-damaged vehicles have defects that show up at a later time. There is evidence from which a jury could determine that the cost of repairs was $10,500. Fidelity's seventh point of error is overruled.

In point of error eight Fidelity argues that the trial court erred in overruling its motion to disregard jury questions numbers four(a), five, and six because there is no evidence to support these findings. These questions inquire as to the relative market values of Underwood's vehicle. We have already considered these arguments in our discussion of Fidelity's first, second and third points of error. Consequently, we overrule Fidelity's eighth point of error.

█ In point of error nine, without citing any authority, Fidelity claims that the trial court committed error in submitting jury question number eight, because there is no evidence, or in the alternative, insufficient evidence [4] to support the submission of this question to the jury. Jury question number eight asks the jury to determine whether Fidelity had violated any of the provisions of the DTPA and Insurance Code. TEX.BUS. & COM.CODE ANN. §§ 17.46 and 17.50 (Vernon 1987); TEX.INS.CODE ANN. art. 21.21 (Vernon Supp.1990). It reads as follows:

## JURY QUESTION NO. 8

Do you find that the Defendant, The Fidelity and Casualty Company of New York, engaged in false, misleading or deceptive acts or practices in the conduct of its trade or business with Dr. Underwood in relation to the policy of insurance, which was a producing cause of damages to Dr. Underwood?

Answer: "We do" or "We do not"

ANSWER: <u>We do</u>

By the term "false, misleading or deceptive acts or practices in the conduct of its trade or business" it is meant the following:

(1) Failing and/or refusing to fairly and honestly negotiate a settlement of Dr. Underwood's insurance claim;

(2) Failing to exercise good faith in processing Dr. Underwood's insurance claim;

(3) Failing to attempt, in good faith, to effectuate a prompt, fair and equitable settlement of Dr. Underwood's claim;

(4) The breach of any implied warranty, if in fact you find same to exist, that an insurance carrier will not fail to refuse to negotiate a settlement of an insured's claim under the insurance policy in good faith;

(5) The breach of any express warranty in an insurance policy, that the insurer will pay for the actual loss sustained by the insured;

(6) Representing that a contract of insurance confers or involves certain rights or benefits which it does not have or involve;

---

4. Under Texas law the argument that a question should not have been submitted to the jury because there is insufficient evidence to support its submission does not present a point of error. *Brown v. Goldstein*, 685 S.W.2d 640, 641 (Tex. 1985). A judge may refuse to submit an issue only if no evidence exists to warrant its submission. *Garza v. Alviar*, 395 S.W.2d 821, 824 (Tex. 1965).

(7) Misrepresenting the actual terms of insurance coverage provided to the insured under a policy of insurance;

By the term "producing cause" it is meant an efficient, exciting or contributing cause, which in natural sequence produces the injuries or damages complained of, if any. There can be more than one producing cause.

As previously stated, when reviewing a "no evidence" challenge, an appellate court must only consider the evidence and reasonable inferences drawn therefrom, which, when viewed in their most favorable light, support the jury verdict or court finding. The court must disregard all evidence and inferences to the contrary of the fact finding. *Stafford*, 726 S.W.2d at 16; *Alm v. Aluminum Co. of America*, 717 S.W.2d 588, 593 (Tex.1986). If there is any evidence of probative force to support the finding, the no evidence point must be overruled. *Stafford*, 726 S.W.2d at 16.

### DUTY OF GOOD FAITH AND FAIR DEALING

██ In 1987, the Texas Supreme Court first recognized the duty of good faith and fair dealing that an insurer owes to its insured in Texas. *Arnold v. National County Mut. Fire Ins. Co.*, 725 S.W.2d 165, 167 (Tex.1987). This judicially created duty of good faith and fair dealing has also been implied to exist in certain contexts through the DTPA and article 21.21 of the Texas Insurance Code. *Vail v. Texas Farm Bureau Nat'l Ins. Co.*, 754 S.W.2d 129, 135 (Tex.1988); Tex.Ins.Code Ann. art. 21.21 (Vernon 1981 and Supp.1990). Recently, in *Aranda v. Insurance Co. of North America*, 748 S.W.2d 210 (Tex.1988), the Supreme Court announced the following two part test in establishing whether the insurer has breached the duty of good faith and fair dealing:

The first element of this test requires an objective determination of whether a reasonable insurer under similar circumstances would have delayed or denied the claimant's benefits. The second element balances the right of an insurer to reject an invalid claim and the duty of the carri-

er to investigate and pay compensable claims. This element will be met by establishing that the carrier actually knew there was no reasonable basis to deny the claim or delay payment, or by establishing that the carrier, based on its duty to investigate, should have known that there was no reasonable basis for denial or delay. Under the test, carriers will maintain the right to deny invalid or questionable claims and will not be subject to liability for an erroneous denial of a claim. Carriers that breach the duty of good faith and fair dealing, however, will be subject to liability for their tortious conduct.

*Aranda*, 748 S.W.2d at 213.

The evidence shows that Fidelity at first represented that the truck was a total loss and then later claimed that it was repairable. Underwood testified that Fidelity wavered in its position four times regarding the issue of whether or not his truck should be considered a "total loss." Underwood testified that Fidelity's vacillation on this issue created a great deal of uncertainty and skepticism on his part concerning whether the vehicle could be repaired to a condition of "like kind and quality." It was undisputed that Fidelity tendered a check in satisfaction of the claim to Underwood's insurance agent and that Underwood refused the check. There was ample evidence that Fidelity knew that Underwood was disputing the claim and that he would not accept the check and that after Fidelity tendered the check, it refused to communicate further with Underwood. Underwood was never informed of his options under the insurance policy, of his right to arbitrate the claim, or of what repairs would restore his vehicle to its pre-loss condition and value.

Nick Woodall, Underwood's original attorney in this case, testified that his calls to Fidelity were never returned and that in the end he was forced to file this suit. Woodall corroborated Underwood's testimony that the insurance company, once it decided the vehicle was repairable, refused to negotiate the claim further. Woodall further testified that in his years of experi-

ence in dealing with insurance claims, Fidelity's conduct was very unusual and outside the standard course of practice for an insurance company in the settlement of an insurance claim.

The evidence that the vehicle was not repairable was extensive. The evidence also established that the vehicle's value after repairs would not approximate its pre-loss value. The testimony at trial established that the wheel bearings, transmission, starter, carburetor, brakes, and certain electrical components would need repair, replacing, or rebuilding; that if the transmission needed to be replaced, then the differential and rear axle would also have to be replaced; and that the vehicle could develop electrical and mechanical problems due to the water damage that would not be covered by the General Motors warranty and which would not show up on initial inspection. Further, the record indicated that other body parts would have corrosion problems that would show up at a later time; that generally flood-damaged vehicles are unreliable; and that the extent of the needed repairs for Underwood's truck exceeded those proposed by Fidelity.

Edwin Kurth, an insurance industry consultant with over thirty-five years experience in the valuation of insurance claims, including flood damage claims, testified that the practices of Fidelity in handling this claim fell outside the industry practice. He testified that Fidelity's failure to communicate with either Underwood or Woodall was outside the norm of acceptable conduct on the part of an insurer.

The Texas Supreme Court has held that as between an insurer and the insured, there is a duty on the part of the insurer to deal fairly and in good faith in the processing of claims. *Vail v. Texas Farm Bureau Mut. Ins. Co.*, 754 S.W.2d 129, 135 (Tex. 1988); *Aranda*, 748 S.W.2d at 212–13; *Chitsey v. National Lloyds Ins. Co.*, 738 S.W.2d 641, 643 (Tex.1987). In the case at

bar there is evidence from which the jury could have found that Fidelity breached this duty. The evidence reflects that Fidelity failed to consider certain provisions of the contract of insurance and failed to negotiate with Underwood. The record indicates that Fidelity made the unilateral decision that the vehicle was repairable and that it foreclosed discussion on other provisions of the contract of insurance. Also, there was substantial evidence that the vehicle was not capable of being repaired as contemplated under the insurance contract. Fidelity's claim that there is no evidence to support submission of jury question number nine is overruled.

Fidelity concedes that its tenth point of error is a restatement of its argument made under point of error nine. Fidelity claims, under this point of error, that the trial court erred in overruling its motion to disregard answers to questions nine, ten and eleven, because there is no evidence or factually insufficient evidence[5] to support the jury's answers to those questions. Jury question number nine asks whether Fidelity "knowingly" violated the DTPA. Jury question number ten asks the jury whether Fidelity "engaged in an unconscionable action or course of action" toward Underwood in relation to Fidelity's obligations under the insurance policy. Jury question number eleven inquires as to the amount of damages caused by Fidelity's breach of its duty of good faith and fair dealing in the settlement of this claim.

Fidelity has dedicated two sparse paragraphs to this point of error and it has failed to direct this Court to either evidence or testimony in the record or to cite any legal authority. Under point of error nine we discussed the appellate standard of review in a no evidence point of error.

Jury question number nine instructs the jury that "knowingly" means:[6]

[A]ctual awareness of the falsity, deception or unfairness of the act or practice giving rise to Underwood's claim, if any,

---

5. Once again an insufficient evidence point as it relates to a motion to disregard a jury question does not present reversible error. *Garza*, 395 S.W.2d at 824.

6. Fidelity does not attack the form of the submission of jury question number nine.

but actual awareness may be inferred where objective manifestations indicate that a person acted with actual awareness.

The evidence and reasonable inferences drawn therefrom, when viewed in their most favorable light, support the finding that Fidelity knowingly committed false, misleading or deceptive acts or practices in its dealings with Underwood. Therefore, Fidelity's no evidence challenge to jury question number nine is without merit.

 Jury question number ten asks the jury to determine whether Fidelity's course of action in dealing with this claim was unconscionable. The question sets out instructions as to what "unconscionable action or course of action" means. The evidence discussed under point of error nine supports a jury finding on unconscionability. We have considered Fidelity's no evidence point as it relates to jury question number ten and conclude that it is without merit.

Fidelity also argues under this point of error that the trial court erred in failing to delineate the various elements of damages under jury question number eleven. Question number eleven asks the jury to determine the amount of damages caused by Fidelity's violations of the DTPA. Our review of the record indicates that no instruction limiting the jury's consideration to specific elements of damages was ever submitted, in writing, by Fidelity. Failure to submit such instructions waives any complaint of error on this issue. *Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535, 538 (Tex.1981); *Osoba v. Bassichis*, 679 S.W.2d 119, 122 (Tex.App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.); TEX.R. CIV.P. 279. Point of error ten is overruled.

In points of error eleven and twelve, Fidelity argues that it was error for the trial court to grant attorney fees at trial and on appeal. Again citing no authority, Fidelity argues that the pleadings do not support an award of attorney fees on appeal and that an award of attorney fees at trial is not justified since Underwood failed to show entitlement to damages greater

than the sum of money tendered by Fidelity.

Fidelity's points of error are contrary to the well-settled rule that a prevailing plaintiff in a DTPA case is entitled to recover his reasonable attorney fees. *Joseph v. PPG Industrial, Inc.*, 674 S.W.2d 862, 867 (Tex.App.—Austin 1984, writ ref'd n.r.e.); TEX.BUS. & COM.CODE ANN. § 17.50(d) (Vernon 1987). We also note that attorney fees are recoverable by the prevailing party in a suit on a contract. *Caldwell & Hurst v. Myers*, 714 S.W.2d 63, 65 (Tex.App.—Houston [1st Dist.] 1986, no writ); TEX.CIV.PRAC. & REM.CODE ANN. § 38.001 (Vernon 1986). Underwood's pleadings do support an award of attorney fees on appeal and Underwood established that he is entitled to a sum greater than the amount offered by Fidelity in its original check and in the amount offered prior to trial to settle the claim. Fidelity's points of error eleven and twelve are overruled.

The trial court's judgment is affirmed.